## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| ROGER LOVELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-07-0412 |
| | § | |
| COVENANT HOMELAND SECURITY | § | |
| SOLUTIONS, LTD., | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND ORDER

Roger Lovell sues his employer, Covenant Homeland Security Solutions, Ltd., asserting an age discrimination claim under the Age Discrimination Employment Act of 1967, 29 U.S.C. § 623. Lovell asserts that in 2006 and 2007, when he was 59, he was denied promotions to Shift Lieutenant and Training Sergeant positions in favor of younger, less-experienced candidates.

Covenant has moved for summary judgment, (Docket Entry No. 24). Lovell has responded, (Docket Entry No. 25), and Covenant has replied, (Docket Entry No. 26). Based on a careful review of the pleadings, the motion, response, and reply, the record, and the applicable law, this court grants in part and denies in part Covenant's motion for summary judgment. The reasons are explained below. This court also sets a status conference for **January 9, 2009, at 10:30 a.m.**

## I.      Background

Lovell served in the United States Air Force for 22 years, rising to the rank of Master Sergeant.  He earned an Associate's degree in criminal justice while in the Air Force.  For the past 20 years, he has been employed by various private security contractors for the United States Department of Energy.  Beginning in 1994, Lovell worked for the security contractor at the Department of Energy's Strategic Petroleum Reserve's Bryan Mound facility near Freeport, Texas, except for a three-month period during which he worked as a Texas police officer.  Since 1994, four different security contractors have provided security for the Bryan Mound facility and Lovell has worked for them all.  During his employment with these contractors, Lovell has served as an Area Lieutenant, Shift Sergeant, Shift Lieutenant, and as temporary Site Training Lieutenant.  (Docket Entry No. 1 ¶¶ 5-6).

Covenant is the last of the four contractors providing security at the Bryan Mound facility during Lovell's time at that site.  Lovell has been employed at Covenant as a Security Patrol Officer since Covenant's contract began on October 1, 2005.  (*Id.*).  The parties do not dispute that Lovell is physically fit and that his physical capabilities exceed the requirements of his current job.

### A.      The Promotion Procedure at the Bryan Mound Facility

When a new position becomes available at the Bryan Mound facility, Covenant publishes a description of the position and notifies employees.  (Docket Entry No. 24, Exs. 1, 17).  Any employee wishing to apply for promotion must submit a resume.  (Docket Entry No. 25 at 5, 11, Exs. B, G, J-K).  The employee's supervisor is asked to fill out a form

confirming that the employee has not been subject to any written warnings or other disciplinary action.  Candidates who pass this initial screening are scheduled for an interview before a panel of Covenant personnel.  This panel, referred to as a Promotion Review Board, consists of three to four individuals from various levels within Covenant.  A human resources representative is occasionally included on the Board.  Before the interview, the Board members receive the candidate resumes for review.  (Docket Entry No. 24, Exs. 25, 28 at 36). Covenant supplies the interviewers with Screening Sheets, which contain a list of twenty questions to be asked at the interview and spaces for scoring and commenting on the candidate's response to each question.

The Screening Sheets for the Shift Lieutenant and Training Sergeant positions were identical.  The questions were as follows:

1. Tell me about your experience with supervising personnel/subordinates at your current location or at a previous employer.

2. Please explain any type of training you have had in supervision in your current position or a previous position.

3. Tell me about a project or program that you have initiated that you would consider a success.

4. Tell me about a project or program that you have initiated that you would consider a failure.

3

5.      Why are you applying for this position?  What do you envision this job to be like?

6.      This is a fast-paced environment in which you will be asked to work on multiple tasks at the same time.  How do you keep yourself organized?

7.      As a supervisor, how would you address an employee that failed to meet SPR training requirements?

8.      This job requires travel to other SPR locations.  How familiar are you with the other sites?

9.      What do you consider a professional strength?

10.     What do you consider a professional weakness?  How have you worked to overcome this weakness?

11.     Explain a time when you had to give a directive to a subordinate in a stressful situation?  How did you handle it?

12.     Please explain how proficient you are with various computer programs/multi-media equipment?

13.     In your opinion, what qualities or skills are needed to be an effective supervisor for the SPR?

4

14.    This position requires you to write thorough and detailed [sic] oriented reports.   Please explain your written communication skills.

15.    How do you handle change in the workplace?   How would you help an employee who is having a hard time dealing with change (i.e. you are evaluating an employee's performance on a new procedure and one employee does not buy in to this new process)?

16.    How do you motivate your employees?

17.    Covenant Homeland Security Services believes that as a team we can accomplish anything.   Tell me about a time when you had to work as part of a team to accomplish a task.   How did you contribute to the success of the team?

18.    Rate the candidate on grooming and attire.

19.    Rate the candidate on communication skills.

20.    Rate the candidate on employment history.

(Docket Entry No. 24, Exs. 10-16, 22-24).

All twenty questions, and only those questions, are asked at each interview. Interviews are conducted in person, although one Promotion Review Board member testified that it is not uncommon for one member from Covenant's New Orleans offices to participate by telephone.  (*Id.*, Ex. 28 at 47).

5

At the interview, each Board member fills out one Screening Sheet for each candidate, scoring the response to each question on a scale from 1 to 5 for a total possible score of 100.  The questions are scored as they are answered.  At the end of the interview, the Board members tally the scores on their own Screening Sheets without discussing their impressions or scores with each other.  The Board sends the Screening Sheets to human resources, where the scores for each candidate are added to obtain a composite score.  The candidate with the highest composite score is awarded the promotion.  (*Id.*, Ex. 28 at 12).  Lovell testified in his deposition that the questions posed to him at his promotion interviews were fair and that he had answered such questions in earlier promotion interviews at the Bryan Mound facility.  (*Id.*, Ex. 26 at 60).

Covenant's written "Transfer, Promotion & Selection Policy" states that in determining promotions:

> Emphasis will be placed on demonstrated job performance, evaluated potential for assuming increased responsibility, prior relevant experience, education, commendations and awards, written test grades and oral interview with board members. When considering candidates for promotion, the following items will be considered: Performance, Adherence to Safety Regulations, Performance Appraisals and Attendance.

(*Id.*, Ex. 25 § 4.6).  The Policy includes a sample "Summary Sheet" and a sample "Records Review Form" that supply numeric scoring guidelines for promotion applications.  According to the Summary Sheet, the interview score should account for 40% of the promotion decision, the "performance appraisal" for 20%, "adherence to safety regulations"

another 10%, "range scores" another 10%, and "personnel records" a final 10%.[1]  (*Id.*, Ex. 25, Attachment B).  The Records Review Form provides a point system for evaluating the personnel records part of the review.  According to this Form, 15 points are to be added to a candidate's personnel records score for an Associate's degree and 40 points each are to be added for police/military and supervisory experience.  (*Id.*, Ex. 25, Attachment A).

It is undisputed that the Sample Sheet and Records Review Form, and the numeric guidelines they supply, were not used for any candidate in deciding the Shift Lieutenant and Training Sergeant promotions at issue.  These promotion decisions were based solely on the Board members' scores, which were in turn based on the candidates' resumes and the responses to the twenty interview questions.  Covenant has submitted an affidavit stating that the Sample Sheet and Records Review Form were not used in any promotion decision at the Bryan Mound facility.  Instead, Covenant conformed its promotion policy at the Bryan Mound facility to the promotion policy of the previous security contractor.  (*Id.*, Ex. 30 ¶¶ 9-10).  Lovell disputes that Covenant never used the Sample Sheet and Records Review Form in making promotion decisions but conceded in his deposition that he had sat on Promotion Review Boards while working for the previous security contractor at the Bryan Mound facility and no such forms were used.  (*Id.*, Ex. 26 at 54-55) ("[N]ormally what I have

---

[1]  These categories add up to 90% of the total assessment.  It is unclear whether the policy requires the consideration of additional factors for the remaining 10% of the decision or what those factors might be.

seen in the past [is] if the guy had the highest score [in the interview], then that's who got the promotion.").

### B.    The Shift Lieutenant Promotion Interview

On August 11, 2006, Covenant posted a job vacancy notice for the position of Shift Lieutenant at the Bryan Mound facility.  The notice listed the minimum qualifications for the position:

> High school diploma is required.   Some college in a law enforcement or security related discipline preferred.  Minimum of 3 years in the Protective Force as a Security Police Officer which may be substituted by 3 years of supervisory experience in a law enforcement, military, or security environment.

(*Id.*, Ex. 1).  Lovell and six other applicants applied.  The other candidates were John Trimmer, Jeffrey Siburt, Frank Magyar, Tom Demaris, Chris Houts, and Favian Lerma. Lovell was the oldest of the group, but Magyar had served the longest.  (Docket Entry No. 25, Ex. A).  On September 20, 2006, all seven applicants were interviewed by a three-member panel, which included Lunningham, Captain Anthony Ybarra, and Lieutenant Kavin Vann.

The interview results were announced on October 2, 2006.  John Trimmer, who was 42, received the highest score and was awarded the promotion.  Lovell received ten fewer points than Trimmer and had the second highest score, followed by Siburt, Magyar, Demaris, Houts, and Lerma.  (Docket Entry No. 24, Ex. 9).   The following table shows the results:

Shift Lieutenant Screening Sheet Results

|  | Trimmer | Lovell | Siburt | Magyar | Demaris | Houts | Lerma |
|---|---|---|---|---|---|---|---|
| Lunningham | 69 | 70 | 72 | 68 | 57 | 64 | 58 |
| Vann | 96 | 90 | 91 | 81 | 86 | 83 | 82 |
| Ybarra | 100 | 95 | 87 | 92 | 90 | 84 | 83 |
| **Total Score** | **265** | **255** | **250** | **241** | **233** | **231** | **223** |

(*Id.*).  Covenant has submitted the Screening Sheets for the Shift Lieutenant interview as summary judgment evidence.  There is no evidence or explanation as to why the Promotion Review Board members awarded these scores or what comments they put on the Scoring Sheets.

Lovell stated in his deposition that he was upset when Trimmer won the promotion but "let it go" because Trimmer also had substantial military experience.  (Docket Entry No. 24, Ex. 26 at 29).  Trimmer was a retired Marine First Sergeant who, in his twenty-two years of service with the Marines, had worked as a security guard and drill instructor.  Trimmer had a high school diploma but had no higher degree.  (Docket Entry No. 25, Ex. G).  Lovell recognized that this promotion decision was "extremely close,"  (*id.*, Ex. 26 at 56), but asserts that given his credentials and experience, he should have received higher interview scores and received the promotion.

### C.     The Training Sergeant Promotion Interview

On November 2, 2006, Covenant posted a job vacancy notice for the position of Training Sergeant at the Bryan Mound facility.   The notice listed the minimum qualifications:

9

> High School diploma is required.  Some college in a law
> enforcement or security related discipline preferred.  Minimum
> of 3 years in the Protective Force and fully qualified as a
> Security Police Officer which may be substituted by 3 years of
> supervisory experience in a law enforcement, military or
> security environment.  Must qualify on all DOE firearms
> qualification courses with a minimum proficiency of 90%.

(*Id*., Ex. 17).  Lovell applied along with two other applicants, Tom Demaris and James

Hargrove.  Lovell was older than Demaris.  The record does not show Hargrove's age.

On December 26, 2006, the three applicants were interviewed by a four-member

Promotion Review Board, which included Vann, Shift Lieutenant Baker, Captain James

Jones, and Travis Alleman.  Vann, Baker, and Jones attended the interview in person and

Alleman participated by telephone.  Alleman, a trainer at another Covenant facility, was a

last-minute substitution, filling in for a Board member who was called away an hour before

the interview was to begin.  The Board member who was called away was himself a

substitute for Tom Demaris's uncle, who had recused himself after learning that his nephew

was seeking the promotion.  (*Id*., Ex. 29 at 20-21, 28).  Alleman testified that he had so little

warning about the interviews that he had no time to review any paperwork other than the

Screening Sheets.  He did not review the candidates' resumes or discuss their prior work

experience with other Board members.  (*Id*., Ex. 29 at 20-21).

The interview results were announced on January 15, 2007.  Tom Demaris, who was

30 at the time of the interview, received the highest score and was awarded the promotion.

Lovell earned the second highest interview score, scoring only one point lower than Demaris.

Hargrove placed last.  The following table shows the results:

10

Training Sergeant Scoring Sheet Results

|  | Demaris | Lovell | Hargrove |
|---|---|---|---|
| Alleman | 77 | 61 | 62 |
| Vann | 94 | 95 | 94 |
| Jones | 81 | 87 | 71 |
| Baker | 89 | 97 | 87 |
| **Total Score:** | **341** | **340** | **314** |

(*Id.*, Ex. 21).

Covenant has submitted the Screening Sheets for the Shift Lieutenant interview as summary judgment evidence.  The only evidence from the Promotion Review Board members about their impressions of the candidates or their reasons for awarding the scores is a statement from the deposition of Promotion Review Board member Jones, who stated that he thought "Lovell did a better job in the promotion board process than Thomas Demaris did" and that Lovell was "confident in his answers, explicit in explaining his prior experience, [and] thorough."  (Docket Entry No. 28 at 14-16).

Lovell was very upset about the result.  He testified in his deposition that he "was pretty floored" about Demaris's promotion because Demaris was "quite a bit younger," and "had none of the qualifications I had."  (*Id.*, Ex. 26 at 39)  Lovell testified that "with what I had to present to the board and the way I presented myself and everything else, that he got the highest score. . . . there is just no way."  (*Id.*, Ex. 26 at 56)  Demaris had received an honorable discharge from the United States Marines after serving for four years, achieving the rank of sergeant.  During his stint with the Marines, Demaris worked as a field radio

11

operator in an artillery unit and spent only one month working in a security guard capacity. After his discharge, Demaris worked at a number of nonsecurity jobs until he began private security work at the Bryan Mound facility in 2002.  Demaris had a high school diploma but no higher education degrees.  (Docket Entry No. 25, Ex. J).

Lovell testified that after the promotion was announced, Jones told him that he was surprised that Lovell had not won the promotion.   According to Lovell, Jones said "[s]omething to the effect [that] the wrong man got promoted."  (*Id*., Ex. 26 at 57).   Jones testified in his deposition that in "watercooler talk" with Baker and Vann, they expressed surprise at the result.  Jones approached Covenant's director of operations to ask how the decision was reached and was told that it was the result of the Board's scoring.  (Docket Entry No. 24, Ex. 28 at 18-19).  Jones also testified that he had no concerns about Demaris in the role of Training Sergeant, (*id*., Ex. 28 at 47), and that although he thought Lovell performed better in the interview, (*id*., Ex. 28 at 17), he was impressed with Demaris's interview and with Demaris's subsequent performance in the job.  Jones described Demaris's interview:

> Demaris was very confident.  He answered questions.  He was very honest.  When we asked him about when he was explaining about his experience he was very, very honest and open about that.  Showed a great deal of promises [sic].  I mean, just very enthusiastic, very confident that he could do the job and has done a fine job.

(*Id*., Ex. 28 at 18).

Lovell asserts that certain corrections on Promotion Review Board member Alleman's screening sheets for Demaris and Lovell raise questions. Alleman crossed out and initialed the scores for six of the twenty questions on Demaris's sheet, adjusting five scores up and one score down for a net gain of five points. Alleman's final score for Demaris was 77. (*Id.*, Ex. 22). Alleman crossed out and initialed scores for three of the questions on Lovell's sheet, adjusting one score up and two scores down for a net loss of two points. Alleman's final score for Lovell was 61. A figure that might be a number next to the "61" on the line for the total score is scratched out on Alleman's score sheet for Lovell. (*Id.*, Ex. 23). Alleman did not initial the scratched-out figure. Alleman testified that he wrote the scores and made the corrections as the candidates answered each question and did not change the scores at the end of the interview. (*Id.*, Ex. 29 at 23-24). Without the corrections to the individual scores, Alleman's score for Demaris would still be nine points higher than for Lovell. Baker and Alleman both confirmed in their depositions that after the Training Sergeant interviews ended, the Board members did not discuss the candidates with each other or with human resources. The reviewers did not see each other's score sheets. (Docket Entry No. 24, Ex. 27 at 18-21, Ex. 29 at 50).

### D.    Lovell's History with the Promotion Review Board Members

Lovell testified in his deposition that he does not believe that any of the Promotion Review Board members for either interview were "out to get [him]." (*Id.*, Ex. 26 at 40). Although he knew very little about Lunningham and Ybarra, he "felt sorry for" Ybarra

because be believed Ybarra was in "over his head." (*Id.*, Ex. 26 at 30-31). Lovell testified that he had a very positive impression of Jones and Baker. (*Id.*, Ex. 26 at 34-36).

Lovell acknowledged that he personally disliked of two of the Board members, Vann and Alleman. Lovell characterized Vann as "a very lazy individual" who had "never been in the military" and lacked "the motivation or whatever to really get in there and do what it takes to do the job." (*Id.*, Ex. 26 at 30). Lovell had heard rumors that Vann believed that Lovell was "hyper" and "had a bad temper." (*Id.*). Lovell confronted Vann on one occasion about the rumors, but Vann denied them. (*Id.*). Lovell testified that he and Vann had always been "fairly cordial" to each other in person. (*Id.*).

Lovell also disliked Alleman, who was based out of a different Covenant facility but who had supervised Lovell and Demaris on three or four occasions while serving as the acting Site Lieutenant at the Bryan Mound facility in 2004. (*Id.*, Ex. 29 at 5, 7, 10-11). Lovell testified that he did not like Alleman's instruction style, did not think Alleman knew his job very well, and was unimpressed with what he perceived as Alleman's reluctance to listen to Lovell's advice about how to perform some of his job responsibilities. (*Id.*, Ex. 26 at 34-35). Lovell testified that he not heard any information about Alleman's opinion of him. (*Id.*, Ex. 26 at 35).

### E.    Lovell's Discrimination Contentions

Lovell contends that he was not promoted to the Shift Lieutenant and Training Sergeant positions because of his age. As evidence of bias, he cites the fact that the successful candidates, Trimmer and Demaris, were significantly younger – 42 and 30,

respectively, as opposed to 59 – and were less qualified in both experience and education. Lovell argues that although Trimmer had 22 years of experience in the Marines (equal to Lovell's 22 years in the Air Force), Trimmer had much less "specialized security training" than Lovell. (Docket Entry No. 25 at 6). Demaris had only four years of military experience with only one month of that spent as a security guard. Lovell also points out that Demaris had only four years of private security experience as opposed to Lovell's twenty. (*Id.* at 12-13). Trimmer and Demaris had only high school diplomas while Lovell also held an Associate's Degree in criminal justice. The job descriptions for both positions identified candidates with advanced degrees as "preferred." (*Id.* at 6, 12-13; Docket Entry No. 24, Exs. 1, 17).

Lovell challenges the interview scoring process and asserts that the results support an inference of age discrimination. Lovell points to the fact that the score Demaris received in his Shift Lieutenant interview was much lower than the score Demaris received in the interview to be promoted to Training Sergeant just three months later. Lovell also emphasizes that some of the scores on Alleman's Screening Sheets were crossed out and rewritten, to Lovell's disadvantage. (*Id.* at 13-18). Lovell also contends that the process was unfair because the Summary Sheet and Records Review Form attached to Covenant's Transfer, Promotion & Selection Policy, (Docket Entry No. 24, Ex. 25, Attachments A&B), were not used in determining either of the promotions at issue. Lovell contends that if these forms had been used, he would have won both positions. (Docket Entry No. 25 at 22).

The summary judgment evidence is examined below under the applicable legal standards and the relevant case law.

## II.     The Legal Standard

### A.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir.2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An issue is material if its resolution could affect the outcome of the action.'"  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308

16

F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### B.    The Age Discrimination in Employment Act

Under the Age Discrimination in Employment Act, it is unlawful for an employer to "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308-09 (5th Cir. 2004). The ADEA makes it unlawful for an employee who is at least 40 years old to be subjected to an adverse employment action because of the employee's age. *See Rutland v. Moore*, 54 F.3d 226, 228 (5th Cir. 1995) (citing 29 U.S.C. §§ 623(a), 631(a)). As with

other types of employment discrimination, age discrimination may be demonstrated either through direct evidence or by an indirect method of proof.  *See Rachid*, 376 F.3d at 309 (ADEA); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (Title VII); *Sandstad v. CB Richard Ellis*, 309 F.3d 893, 896 (5th Cir. 2002) (ADEA); *see also Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000) ("The same evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both [Title VII and the ADEA].").  "A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden."  *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996).  "However, because direct evidence of discrimination is rare, the Supreme Court has devised an evidentiary procedure that allocates the burden of production and establishes an orderly presentation of proof in discrimination cases."  *Id.*; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000); *see Laxton*, 333 F.3d at 578; *Sandstad*, 309 F.3d at 896.

If there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multifactor test from which a discriminatory motive may be inferred, creating a rebuttable presumption of intentional discrimination.  *See Reeves*, 530 U.S. at 142; *Sandstad*, 309 F.3d at 896.  "'To establish a *prima facie* case, a plaintiff need

18

only make a very minimal showing.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41

(5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639

(5th Cir. 1985)).  The elements of a *prima facie* age discrimination failure-to-promote case

are: (1) the plaintiff was not promoted; (2) he was qualified for the position at issue; (3) he

was within the protected class; and (4) he was replaced by someone younger or outside the

protected group, or treated less favorably than similarly situated younger employees.  *Smith*

*v. Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003), *aff'd on other grounds*, 544 U.S. 228

(2005); *see also Joseph v. City of Dallas*, 277 Fed. Appx. 436, 439 (5th Cir. 2008).  A *prima*

*facie* case creates a presumption that the employer unlawfully discriminated against the

plaintiff.  *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999).

   If the plaintiff establishes a *prima facie* case of discrimination, the defendant must

proffer a legitimate nondiscriminatory reason for the challenged employment decision.

*Russell*, 235 F.3d at 222; *Bauer*, 169 F.3d at 966.  "This burden on the employer is one only

of production, not persuasion, involving no credibility assessments."  *Russell*, 235 F.3d at

222; *see Bauer*, 169 F.3d at 966 ("The defendant must clearly set forth, through the

introduction of admissible evidence, reasons for its actions which, 'if believed by the trier

of fact,' would support a finding that unlawful discrimination was not the cause of the

employment action." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993))).

"An employer's subjective reason for not selecting a candidate, such as a subjective

assessment of the candidate's performance in an interview, may serve as a legitimate

nondiscriminatory reason for the candidate's non-selection."  *Alvarado v. Tex. Rangers*, 492

F.3d 605, 616 (5th Cir. 2007) (citations omitted).  "Such a reason will satisfy the employer's burden of production, however, only if the employer articulates a clear and reasonably specific basis for its subjective assessment."  *Id.*  (citations omitted).

If the defendant meets its burden of production, the presumption of discrimination created by the *prima facie* case disappears, and the plaintiff is left with the ultimate burden of proving discrimination.  *Hicks*, 509 U.S. at 511-12.  "[T]he plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)."  *Rachid*, 376 F.3d at 312 (internal quotations and citations omitted).  If the plaintiff presents evidence that age was a motivating factor in the decision, the defendant must prove that it would have made the same decision regardless of any discriminatory motive."  *Id*.

## III.    Analysis

Lovell has shown a *prima facie* case of age discrimination in the Shift Lieutenant and Training Sergeant promotion decisions.  Lovell has shown, and Covenant has not disputed, that: (1) he was not promoted; (2) his resume and experience qualified him for the positions at issue; (3) at age 59, he was within the class of persons protected by the ADEA; and (4) the positions were given to younger candidates.  *Joseph v. City of Dallas*, 277 Fed. Appx. at 439; *Smith v. Jackson, Miss.*, 351 F.3d at 196.  The burden shifts to Covenant to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, 'if believed

by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action."  *Bauer*, 169 F.3d at 966 (quoting *Hicks*, 509 U.S. at 507) (emphasis added).  Lovell has alleged discriminatory bias through what he contends to be unfairly low scoring in the interview process and through Covenant's failure to use the sample "Summary Sheet" and "Records Review Form" attached to Covenant's written Transfer, Promotion & Selection Policy.  Each of these contentions is addressed in turn.

### A.    The Interview Scores

Covenant's stated reasons for not awarding the Shift Lieutenant or Training Sergeant positions to Lovell are the same for each of the two positions at issue.  "Quite simply, Lovell was not awarded the Shift Lieutenant position[ ] because he did not score the highest in the interviews before the Promotion Review Board."  (Docket Entry No. 24 at 15).  "Demaris was awarded the Training Sergeant position by virtue of receiving the highest combined score from the Promotion Review Board." (*Id*. at 21).  Covenant, however, has not provided any evidence or explanation as to why Lovell received lower interview scores.  The evidence shows that the scores are simply the Promotion Review Board members' assessments of each candidate's answers to twenty questions posed in an interview.  "An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection. *Alvarado*, 492 F.3d at 616.  But such interview scores, "[w]ithout some indication of the factual basis or specific reasons for [the] interview score," do not

satisfy the defendant's burden of proffering a nondiscriminatory reason for the failure to promote.  *Id*. at 617.

In *Alvarado*, a Title VII sex discrimination case, the female plaintiff sued after being rejected for a promotion.   In response to the plaintiff's *prima facie* showing of discrimination, the defendant produced evidence showing that the plaintiff had "received interview scores of 300, 325, 345, 375 at 390, for a cumulative score of 347.5," ranking her twenty-ninth of 40 second-round candidates.   *Id*.  The Fifth Circuit reversed the district court's grant of summary judgment to the defendant, citing the fact that the defendant had failed to meet its burden of production by "offer[ing] neither an explanation nor evidence of how or why the interviewers arrived at those scores."  The court held:

> Alvarado's score sheets contain no notes or comments on her interview performance, and DPS has not pointed to any deposition testimony that would shed light on why they scored Alvarado and the other candidates the way they did.  Without some indication of the factual basis or specific reasons for Alvarado's interview score, the score says nothing about whether her non-selection for the Rangers was the product of intentional sex discrimination.  Instead, the score "is at least as consistent with discriminatory intent as it is with nondiscriminatory intent" because Alvarado may well have received the relatively low interview score on account of her sex.  Because DPS has pointed to no evidence in the summary judgment record that clarifies or expands upon why Alvarado received the relatively low interview score, DPS's ostensibly legitimate, nondiscriminatory reason for Alvarado's non-selection – her performance in the promotion and selection process – is insufficient to satisfy DPS's burden of production.

*Id*. (internal citations omitted).   Because the defendant failed to meet its burden of production, the Fifth Circuit declined to "reach the question of whether Alvarado could

demonstrate pretext or otherwise show that her failure to receive an appointment to the Rangers was actually motivated by sex discrimination." *Id.* at 618.

The *Alvarado* court was careful to add that it had no categorical objection to the use of interview scores as a means of determining promotions. "We do not doubt the prudence of the [interview] process as a method of identifying those best suited to work as Rangers, and we agree with the district court that nothing in the summary judgment evidence indicates that the process is inherently discriminatory." *Id.* at 617. The problem with the summary judgment ruling was that by "fail[ing] to evidence the grounds for the Board's scoring of Alvarado and the other candidates," the defendant had "failed to proffer a reason for Alvarado's non-selection that, if believed, would allow the jury to conclude that Alvarado's non-selection was not the result of intentional sex discrimination." *Id.*

The Fifth Circuit has since applied *Alvarado* to cases alleging age discrimination. *See Joseph v. City of Dallas*, 277 Fed. Appx. at 441 (endorsing *Alvarado* test as appropriate when interview scores are the basis of the promotion decision in an age discrimination case). *Alvarado* is also consistent with earlier Fifth Circuit case law. *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (rejecting as insufficient the defendant's statement that the plaintiff alleging age discrimination was not "sufficiently suited" for position and holding that "to rebut an employee's *prima facie* case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee"); *Koettner v. Northrop Grumman Comm. Info. Serv's, Inc.*, 3:03-CV-2208, 2005 WL 781708, at **2-4 (N.D. Tex. Apr. 6, 2005) (the defendant's use of a numeric "rank order analysis"

23

for determining which employees to lay off was "insufficient, standing alone, to constitute a legitimate, non-discriminatory explanation" for the plaintiff's termination in an age discrimination suit because the "[d]efendant had not introduced evidence that [the plaintiff] was selected for termination for any specific reason" but merely asserted that it had "reviewed the Rank Order Analysis and found other employees to be "more qualified").

In age discrimination cases involving hiring or promotion decisions based on interview scores, defendants meeting the burden of producing a legitimate, nondiscriminatory basis for the decision typically produce evidence of the interviewers' reasons for their evaluation of the plaintiff.  In *Joseph v. City of Dallas*, 277 Fed. Appx. at 441, for example, the Fifth Circuit concluded that the defendant had met its burden with evidence showing that the plaintiff had received poor scores in his interview because he "provided poor answers to the hypothetical police scenarios and seemed unable to logically process information."  Two of the interviewers also submitted affidavits explaining their reasons for the low scores they gave the plaintiff.  *Id.*  Similarly, in *Hollaway v. Woodlet*, 203 Fed. Appx. 563, 566 (5th Cir. 2006), the Fifth Circuit concluded that the defendant had met its burden by submitting testimony from the interviewers that the plaintiff was "curt and blunt during her interview" and "did not make any effort to answer the questions."  In *Todd v. Natchez-Adams School Dist.*, 160 Fed. Appx. 377, 379 (5th Cir. 2005), the Fifth Circuit held that the defendant had met its burden of production by submitting testimony from the interviewers that the plaintiff "did not address questions precisely and did not provide much detail regarding the plans she would implement if she were selected for the position," and by submitting interview score

24

sheets with comments that the plaintiff's responses were "too lengthy" and that she "seeme[d] to ramble a bit."  In *Solorzano v. Shell Chem. Co.*, 254 F.3d 1082, 2001 WL 564154, at *6 (5th Cir. May 18, 2001), the Fifth Circuit concluded that the defendant had met its burden by producing evidence that the plaintiff "had been given low scores by the panelists, not because of the answers he had given during the interview, but because, during their time working with him over the years, the panelists had a negative impression of him and believed he would not be successful in a leadership role."

Covenant has offered no similar evidence in this case.  Covenant submitted the Screening Sheets for each candidate, but most of these sheets contain only the bare numeric scores for the answers to the twenty questions.  Although a few Screening Sheets have comments from the Board member, these comments merely summarize the candidate's response to the questions and do not reveal the interviewer's impressions.  (Docket Entry No. 24, Exs. 10-16, 22-24).  Covenant's briefs do not point to any deposition or affidavit testimony by the Board members stating the reasons why Lovell received the interview scores given.  Covenant conclusorily argues that because Lovell's interview scores were lower than the winning candidates,'" that "Lovell cannot show that [this] legitimate, non-discriminatory reason for selecting Trimmer [and Demaris] over the other candidates . . . is pretextual."  (Docket Entry No. 14 at 16, 19-20).  This argument misplaces the burden.  Before Lovell must show a fact issue as to pretext, Covenant must meet its burden of proffering "a clear and reasonably specific basis for its subjective assessment[s]" in the interviews."  *Alvarado*, 492 F.3d at 616.  Covenant has not done so.  Summary judgment is

denied on Lovell's claim that he was denied promotion to the Shift Lieutenant and Training Sergeant positions based on age discrimination in the Board members' scoring.

### B.     Discriminatory Age Bias in the Failure to Use Policy Forms

Lovell has also alleged age discrimination in Covenant's failure to use the "Records Review Form" and "Summary Sheet" attached to its Transfer, Promotion & Selection Policy. (Docket Entry No. 24, Ex. 25, Attachments A&B).  Lovell alleged that if the Records Review Form, which assigns additional points for higher education degrees and supervisory experience, and the Summary Sheet, which makes the results of the Records Review Form worth 10% of each candidate's score, had been used, he would have won the positions. Lovell argues that Covenant's failure to use these forms in deciding the Shift Lieutenant and Training Sergeant positions is indicative of age bias.  Lovell asserts that he was the only candidate "who would have benefitted from the application of" the forms because the "younger, less experienced and less educated applicants d[id] not possess" the qualifications that would be awarded extra points.  (Docket Entry No. 25 at 22-23).

Covenant counters with an affidavit by Cynthia Lunningham, Covenant's Director of Business Services.  Lunningham explains that the Summary Sheet and Records Review Form attached to Covenant's promotion policy have never been used at the Bryan Mound facility. She states that after "numerous discussions regarding the categories to be scored and the scoring percentage for each of the categories, it was decided to utilize only the Screening Sheets, which had been used by the predecessor security contractor" at the Bryan Mound facility.  (Docket Entry No. 24, Ex. 30 ¶ 9).

26

Lovell objects to Lunningham's affidavit on the ground that it was not submitted until after discovery ended, making it "untimely." This argument is not persuasive. Covenant points out that it disclosed Lunningham's identity in initial disclosures, Lunningham was present at several of the depositions, and through discovery, Lovell "was informed of [Covenant's] promotion policy . . . and learned that some forms attached to that policy had never been used by [Covenant]" at the Bryan Mound facility. (Docket Entry No. 26 at 1-2). Lovell also argues that "any documents reflecting the 'numerous discussions' Ms. Lunningham describes in her affidavit should have been produced long ago," and that "Defendant has produced exactly zero [such] documents." (Docket Entry No. 25 at 7-10). But Lovell does not identify any request for production to which such documents would be responsive and Covenant does not argue that any such documents exist.

Lovell also argues that Lunningham's affidavit is controverted by the deposition testimony of James Jones, one of the members of the Promotion Review Board for the Training Sergeant position. Jones testified in his deposition that although the Records Review Form had not been used in the Training Sergeant promotion, he had "seen it used." (Docket Entry No. 25, Ex. H at 38). Jones also testified that a form similar to the Records Review Form that "broke stuff down" had been used by Covenant's predecessor at the Bryan Mound facility. (*Id.*). However, Lunningham's explanation of the use of the forms in making promotion decisions at the Bryan Mound facility is consistent with Lovell's own understanding. Lovell testified that on the several occasions he sat on a Promotion Review Board for Covenant's predecessor at the Bryan Mound facility, forms like the Records

27

Review Form and Summary Sheet were not used.  Instead, "if the guy had the highest score [on the interview,] then that's who got the promotion."  (Docket Entry No. 24, Ex. 26 at 54-55).

Even without considering Lunningham's affidavit, however,  Covenant has produced a legitimate nondiscriminatory explanation for its deviation from the written policy in the Shift Lieutenant and Training Sergeant interviews.  The summary judgment record shows no basis for an inference of pretext or discrimination.  Fifth Circuit case law makes clear that an employer's "disregard of its own hiring system does not of itself establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual." *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989) (concluding that even if defendant "did erroneously fail to 'use' the objective appraisals [provided by policy] in his promotion decisions, there was absolutely no evidence presented that he did so in a sexually discriminating manner").  "Proof that an employer did not follow correct or standard procedures" does not establish an ADEA violation.  *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir.), *cert. denied*, 510 U.S. 976 (1993).  "To make out an ADEA claim, the plaintiff must establish the existence of discrete facts that show some nexus between the employment actions taken by the employer and the employee's age. . . .  [A] bald assertion that one exists . . . simply will not suffice."  *Id.*; *see also EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1182-83 (5th Cir. 1996) (concluding that the EEOC had failed to prove the requisite nexus between the defendant's decision not to follow its usual seniority-protective policy in administering layoffs and an intent to discriminate by age).

28

Although Covenant did not use the sample Records Review Form and Summary Sheet attached to its Transfer, Promotion & Selection Policy in making the promotion decision at issue, there is no evidence that it singled out these promotion decisions for such treatment. The evidence shows that the promotion procedure followed in both the Shift Lieutenant and Training Sergeant interviews was consistent with the written Policy, which requires that the Promotion Review Board consider, among other factors, prior relevant experience and education.[2]  (Docket Entry No. 24, Ex. 25 § 4.6).  Before each interview, the Promotion Review Board would receive the candidates' resumes for review.  Board members had the information about degrees attained and relevant prior experience that the Records Review Form captures.  Some of the interview questions on the Screening Sheets also elicited this type of information, and the answers to these questions were included in the candidates' scores.  Although using the Records Review Form would require Promotion Review Board members to assign point values to  education and supervisory experience, the Records Review Form score accounted for no more than 10% of a candidate's total score.  The oral

---

[2]  The Policy states, in relevant part:

> The promotion review board will convene for the purpose of selecting the best qualified candidate for promotion to a CHSS Supervisory or staff position.  Emphasis will be placed on demonstrated job performance, evaluated potential for assuming increased responsibility, prior relevant experience, education, commendations and awards, written test grades and oral interview with board members.  When considering candidates for promotion, the following items will be considered: Performance, Adherence to Safety Regulations, Performance Appraisals and Attendance.

(Docket Entry No. 24, Ex. 25 § 4.6).

interview counted for 40%, the performance appraisal 20%, adherence to safety regulations 10%, and range scores 10%. (*Id.*, Ex. 25, Attachment B). There is no basis for concluding that using a form that would give education and experience a numeric score worth no more than 10% of the final score would change the outcome from using a Screening Sheet based on answers to questions eliciting similar information.

Lovell argues that he "was deprived of 15 points for his educational degree" and that this caused him to lose the Shift Lieutenant position (which he lost by 10 points), and the Training Sergeant position (which he lost by 1 point). (Docket Entry No. 25 at 7, 13). Using the Records Review Form and Summary Sheet would have added 15 points to one part of Lovell's evaluation. That part would have accounted for only 10% of his final score. Lovell has not addressed whether the other scores that were not included in the Shift Lieutenant and Training Sergeant evaluations – performance appraisal, safety evaluation, and range scores, which would have accounted for 40% of the total score had the Summary Sheet been used – would have affected his score, and if so, in what way. In short, there is no basis for an inference that the outcomes of the Shift Lieutenant and Training Sergeant promotions would have been affected by using the Records Review Form and Summary Sheet. There is even less evidence of a nexus between the omission of these forms – an omission that also excluded consideration of performance appraisal, safety evaluation, and range scores, factors for which age would not confer a likely advantage – and any possible age bias.

Lovell has failed to point to or present evidence that gives rise to a disputed fact issue as to whether Covenant's deviation from its written Policy on the interview process is discriminatory.  Covenant is entitled to summary judgment on this issue.

**IV.    Conclusion**

Covenant's motion for summary judgment is denied in part and granted in part.  A status conference is set for **January 9, 2009, at 10:30 a.m.**

SIGNED on December 23, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

31